# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON | No.  58702-5-II |
| Respondent, | |
| v. | |
| CHRISTOPHER RICHARD KOCH, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, J. — Christopher R. Koch appeals his convictions for multiple counts of first degree identity theft, second degree identity theft, and forgery.  Koch argues (1) that there was insufficient evidence supporting his convictions, (2) that the trial court violated his right to present a defense by excluding two defense witnesses, and (3) that he received ineffective assistance of counsel when counsel failed to timely disclose defense witnesses and failed to secure the trial court's permission for remote testimony pretrial.

We hold that (1) there was sufficient evidence supporting Koch's convictions, (2) the trial court properly excluded two defense witnesses pursuant to ER 404(b), and (3) any failure to timely disclose witnesses or secure remote testimony was attributable to Koch.  Therefore, we affirm Koch's convictions.

FACTS

A.    INVESTIGATION

In May 2021, the Tacoma Police Department (TPD) received a report from a local business concerning a potential financial crime.  Over the first several months of 2021, multiple Pierce

County residents and business owners discovered that the checks they had written had been altered and made payable to people or businesses other than those for which they were originally intended.

Detective Elizabeth Schieferdecker, a detective with TPD's fraud and financial crimes unit, began investigating a Wells Fargo Bank account. Detective Schieferdecker learned that in January 2021, a "Christopher Koch" opened a Wells Fargo "Business Account" in the name of "Supreme Auto Sound LLC." Ex. 1 at 2 (some capitalization omitted). Detective Schieferdecker subsequently searched public databases for Supreme Auto Sound's certificate of formation and learned that the LLC was formed in October 2020 and its registered agent was "Chris Koch." Ex. 2 at 1 (some capitalization omitted). Detective Schieferdecker noted that the address on the certificate of formation matched the address on the Wells Fargo account application.

Detective Schieferdecker reviewed records from Wells Fargo and discovered that 25 checks had been deposited into Koch's Wells Fargo account and all of the checks were deposited via mobile deposit. Detective Schieferdecker identified only one check in the amount of $1,400— a pandemic payment from the United States Treasury—that "did not appear to be altered." 6 Verbatim Rep. of Proc. (VRP) at 498. Of the approximately $57,000 deposited into the account, $27,092.45 was reversed. As of May 2021, $30,035.04 had been successfully deposited into the account and $36,638.79 had been spent.

Detective Schieferdecker then requested photographic evidence of transactions in the account "to determine who was physically conducting" them. 6 VRP at 499. In April 2021, someone made a $700 cash withdrawal from an ATM (automatic teller machine), and Wells Fargo was able to provide Detective Schieferdecker a photograph the ATM camera captured of the person withdrawing the cash.

As Detective Schieferdecker continued the investigation into the Wells Fargo account, a Columbia Bank[1] employee informed Detective Schieferdecker "of a new account that had contained some fraudulent activity as well." 6 VRP at 501. Detective Schieferdecker obtained the application for the Columbia account, which showed the account had been opened by "Christopher R Koch" in June 2021. Ex. 4 at 1. Detective Schieferdecker noted that the address on the Columbia account application matched the address on the Wells Fargo account application.

The State charged Koch with ten counts of first degree identity theft, one count of second degree identity theft, and three counts of forgery.[2]

B.    STATE'S CASE-IN-CHIEF

The case proceeded to a jury trial in July 2023.

1.    Altered Checks

At trial, the State called several witnesses whose personal or business checks had been stolen, altered, and deposited into Koch's accounts.

Sarah Consalvi, a business owner, testified that she wrote, signed, and mailed a $2,028.75 check to "Safety Shirtz" in June 2021. 4 VRP at 217. Later, Safety Shirtz called Consalvi and informed her that they never received the check. A copy of the check was admitted into evidence.

---

[1] In March 2023, Umpqua Bank and Columbia bank merged under the name Umpqua Bank. However, both parties referred to Koch's Columbia Bank account throughout trial, and we do the same.

[2] The State originally charged Koch with thirteen counts of first degree identity theft, three counts of second degree identity theft, and four counts of forgery. However, because several witnesses chose not to testify or were otherwise unavailable, the State moved to dismiss several charges, which the trial court granted. The State subsequently filed an amended information charging Koch with ten counts of first degree identity theft, one count of second degree identity theft, and three counts of forgery.

The check had been altered to be payable to "Christopher Koch" and had been deposited via mobile deposit into Koch's Columbia Bank account. Ex. 16 at 2. Consalvi testified she did not know Koch and never gave him permission to alter the check.

Donette Nelson, a business owner, testified that in March 2021, she wrote and mailed a check for $1,000 to Spokane Teacher Credit Union. A copy of the check was admitted into evidence, showing that the payee had been altered to "Christopher Koch." Ex. 1 at 33. The memo line read "car audio work." Ex. 1 at 33. Nelson testified that she did not know Koch and never gave anyone but her husband permission to alter her checks. Nelson also testified that she did not write "car audio work" in the memo line and that had her car needed work, she had a specific business—not Koch's—that she would have patronized. 4 VRP at 255. The check was deposited via mobile deposit into Koch's Wells Fargo Bank account.

Pier Mitchell testified that in spring 2021, she purchased and mailed a $3,300 cashier's check to pay for some landscaping work. The check was originally payable to New Dimension Lawn. However, a copy of the check admitted into evidence revealed that the payee had been altered to "Christopher Koch." Ex. 1 at 51. Mitchell testified that she did not know Koch and never gave anyone permission to alter the cashier's check. The check was deposited via mobile deposit into Koch's Wells Fargo Bank account.

Brendan Manning, a business owner, testified that in April 2021, he wrote and mailed a $5,635.00 check to his company's landlord. However, a copy of the check admitted into evidence showed that the payee had been altered to "Christopher Koch." Ex. 1 at 56. Manning testified that he did not know Koch, nor was the signature on the back of the check Manning's. Manning

4

also testified that the check's memo line originally read "'rent,'" but that it had since been altered. 5 VRP at 375. The check was deposited via mobile deposit into Koch's Wells Fargo bank account.

Cynthia Kirchner testified that she used to be a finance manager at a church. In April 2021, Kirchner wrote a $4,481.28 check to Bible Literature and Missionary Foundation. However, a copy of the check admitted into evidence showed that the payee had been altered to "SUPREME AUTO SOUND (christopher koch)." Ex. 1 at 60. Kirchner testified that she did not know Koch or Supreme Auto Sound, nor was the signature on the back of the check hers. The check was deposited via mobile deposit into Koch's Wells Fargo Bank account.

Madeline Webber, the general manager of a doughnut shop, testified that she managed payments coming in and going out of the business. Webber testified that in March 2021, her boss wrote and she mailed a $7,248.72 check to BakeMark. However, a copy of the check admitted into evidence revealed that the payee had been altered to "Christopher Koch." Ex. 1 at 37. Webber testified that she did know Koch and had no reason to pay Koch. The check was deposited via mobile deposit into Koch's Wells Fargo bank account.

Glen Kazda testified that in April 2021, he wrote and mailed a $2,578.77 check to the Pierce County Assessor for his property taxes. However, a copy of the check admitted into evidence showed that the payee had been altered to "Supreme Auto Sound LLC." Ex. 1 at 45. Kazda testified that he did not know Koch, did not conduct any business with Supreme Auto Sound, and had never heard of the company. Kazda also did not write "Scott (00540) car Audio" on the check's memo line. Ex. 1 at 45. And Kazda did not sign the back of the check. The check was deposited via mobile deposit into Koch's Wells Fargo Bank account.

5

Sara Corbishley testified that in March 2021, she wrote a $4,963.74 check to Pierce County Finance for her property taxes. However, a copy of the check admitted into evidence showed that the payee had been altered to "Pierce County Supreme Auto Sound LLC." Ex. 1 at 41. Corbishley testified that she had originally written her property's parcel number in the check's memo line, but that it had since been altered to read "Supreme Auto Sound Work." Ex. 1 at 41. While Corbishley testified that she recognized Koch from a social media search, she also stated she did not know him prior to the check being altered, and had never done business with Supreme Auto Sound. The check was deposited via mobile deposit into Koch's Wells Fargo Bank account.

James Olp testified that in spring 2021 he wrote and mailed a $3,077.26 check to his yard servicers. However, a copy of the check admitted into evidence showed that the payee had been altered to "Supreme Auto Sound." Ex. 1 at 43. Olp testified that he did not recognize Koch, never gave anyone permission to alter the check, and did not sign the back of the check. The check was deposited via mobile deposit into Koch's Wells Fargo bank account.

Finally, Sheree Toniolo, an accounting manager at a law firm, testified regarding six checks. Toniolo testified that in February 2021, the firm wrote and mailed a $240.00 check to Accufacts Research Corporation. However, a copy of the check admitted into evidence showed that the payee had been altered to "Christopher Koch." Ex. 1 at 7. The same month, the firm wrote and mailed a $61.49 check to Pierce County Finance. However, a copy of the check admitted into evidence showed that the payee had been altered to "Christopher Koch." Ex. 1 at 9. The firm also wrote and mailed a $8,011.08 check in February to Franke Tobey Jones. However, a copy of the check admitted into evidence showed that the payee had been altered to "Christopher R. Koch (Supreme Auto Sound)." Ex. 1 at 18.

In March 2021, the firm wrote and mailed a $1,412.49 check to a payee whose name Toniolo could not recall. A copy of the check admitted into evidence showed the payee as "Supreme Auto Sound." Ex. 1 at 26. Toniolo testified that she was unaware of any payments from the firm to Supreme Auto Sound or Koch. The same month, the firm wrote and mailed a $600.00 check to an entity associated with the firm. However, a copy of the check admitted into evidence showed that the payee had been altered to "Christopher R Koch." Ex. 1 at 28. Also in March, the firm wrote and mailed a $910.70 check to a client. However, a copy of the check admitted into evidence showed that the payee had been altered to "Christopher Koch." Ex. 1 at 30.

All six checks written by the law firm were deposited via mobile deposit into Koch's Wells Fargo Bank account. Toniolo testified that she did not recognize Koch and was unaware of any payments from the firm to Koch or his business. Toniolo also did not give anyone permission to alter any of the checks at issue.

2.    Investigation

Detective Schieferdecker testified about her investigation into the altered checks. During Detective Schieferdecker's testimony, the trial court admitted into evidence a surveillance photograph from an ATM showing someone making a $700 cash withdrawal from Koch's Wells Fargo Bank account in April 2021. Koch later acknowledged that he was the person in the photograph. Detective Schieferdecker also testified that she could not "be a hundred percent positive Mr. Koch made the mobile deposits we've been discussing." 6 VRP at 546.

Jan McGinnis, a senior fraud investigator at Columbia Bank, testified that mobile deposit was a method of depositing a check into an account using an application on a mobile phone. To

7

make a mobile deposit, an account holder would first have to download their bank's mobile application. To make a mobile deposit, the account holder would have to register their account on the application using their account number, Social Security number, and date of birth. McGinnis explained that using mobile deposit was the only way a person could deposit money into an account without leaving some sort of visual record. If a person knew an account holder's username and password, and had access to the account holder's device, they could log into an account holder's mobile banking application and make mobile deposits. In such a scenario, the bank would be unable to verify that the deposit was made by the account holder.

During McGinnis's testimony, the trial court admitted into evidence three photos that McGinnis retrieved from Columbia Bank's surveillance systems. Exhibit 9 depicted someone opening a Columbia Bank account, while exhibits 8 and 7 depicted the same person standing next to a bank employee and exiting the bank, respectively. Koch later acknowledged he was the person in exhibit 9.

C.    OTHER POTENTIAL DEFENSE WITNESSES

Prior to trial, Koch told the trial court that he intended to call no witnesses besides himself. However, during the State's case-in-chief, defense counsel relayed to the trial court "the defendant's concern [that] more information needs to be provided from his sister, Jennifer Koch." 6 VRP at 426. The trial court responded that it would address Koch's offer of proof during a later break. When the trial court addressed Koch's offer of proof regarding Jennifer,[3] Koch informed the trial court he also had an offer of proof regarding another potential defense witness—Richard

---

[3] Because Koch, his sister, and his father all share a last name, we refer to Koch's sister as "Jennifer" and to Koch's father as "Richard" to avoid confusion. We intend no disrespect.

Koch. Koch offered that both Jennifer and Richard would testify that other Supreme Auto Sound employees—Tyler Mackey and Jason White—were actually the perpetrators of the financial crimes with which Koch was charged.

Following the State's final witness and shortly before the State rested, Koch made the following offer of proof regarding Jennifer's testimony:

> The witness I'm asking to add is Jennifer N. Koch. She's the sister of Mr. Koch. She worked for Mr. Koch at Supreme Auto from December 2018 until the middle of 2021. She has knowledge under the general defense of Mr. Koch for Tyler Mackey and Jason White as follows:
> Tyler Mackey was a homeless person staying at the Supreme Auto. He was an employee. Jason White stayed at Supreme Auto. They both were upstairs. He was an employee.
> Jennifer Koch managed the accounts for Supreme Auto. Jennifer Koch learned that they were actively stealing checks and creating false credit cards, but not in the matter before us. Mr. Koch did not know about this until she told him in June of 2021. Unfortunately, she has some criminal history herself. She stated that [Koch] is a very trusting person that trusts nearly everyone.

6 VRP at 527-28.

Koch also made the following offer of proof regarding Richard's testimony:

> There's also an offer of proof that I informed the prosecutor, albeit late, that Richard F. Koch, who is the defendant's father, who has the same knowledge that Jennifer Koch has, but for he didn't do the accounting, but he's familiar with Mr. Koch's tax returns at Supreme Auto Sound.

6 VRP at 528.

The State's objections to and the trial court's rulings on Richard and Jennifer's testimony are as follows:

1.    Richard Koch

The State objected to Richard testifying, arguing that Richard's knowledge regarding Koch's employees' past misconduct was speculative. The State also argued that Richard's

9

testimony was impermissible propensity evidence: "[W]hat's . . . being offered is that [Mackey and White] may have stolen checks in the past, therefore, they stole checks in this case." 6 VRP at 529-30.

The trial court stated that if Koch testified, his testimony would cover much of the same evidence Richard could allegedly provide. The trial court continued, "I'm still a little bit in the dark on Richard Koch's testimony with regard to tax returns. Is this also testimony that supports this 404(b) issue of the employees?" 6 VRP at 536. Defense counsel responded, "It would be verification that they were actually employees of Supreme Auto Sound." 6 VRP at 536. The trial court responded that, without more, Richard's testimony would be duplicative of Koch's and his sister's, assuming they testified. The trial court excluded Richard's testimony based on late disclosure and the cumulative nature of Richard's testimony.

Despite the trial court's ruling, Koch later argued that Richard's testimony was not hearsay or speculative because Richard "visited Supreme Auto Sound numerous times and knows Jason White and Tyler Mackey were employees." 7 VRP at 611. The trial court stated that it was still concerned about prejudice to the State given the late disclosure. The trial court also stated that if Koch were to testify as expected, Mackey and White's employment status would not be a contested issue. Therefore, the trial court reiterated that it would not allow Richard to testify because his testimony was "duplicative and otherwise not helpful to the trier of fact." 7 VRP at 621.

2.    Jennifer Koch

a.    July 17 proceedings

The State also objected to Jennifer's testimony. First, the State noted it had found no criminal history for either Mackey or White, and argued that anything Jennifer knew about Mackey

and White's past misconduct was speculative. Second, the State argued that offering evidence of Mackey's and White's past misconduct was inadmissible under ER 404(b) because Koch was merely offering it to make an improper propensity argument. Third, the State noted its intention to offer Jennifer's prior conviction for forgery pursuant to ER 609 should she testify.

In response, the trial court inquired into what evidence Koch had to support his employees' prior misconduct and whether Jennifer had personal knowledge of the employees' prior misconduct or any corroborative evidence. Defense counsel responded, "Mr. Koch is telling me Jennifer Koch has a notebook with all of the information about the stolen checks in the past." 6 VRP at 532. Defense counsel also stated the notebook had not been provided to the State and that he had "just learned of" it himself. 6 VRP at 532. The trial court responded, "Okay. That presents some issues here with regard to prejudice to the State." 6 VRP at 532.

The State interjected and noted its concerns that Jennifer might incriminate herself by "being in possession of identity theft materials." 6 VRP at 533. The State also noted concerns that Jennifer's testimony would incriminate Koch's employees and potentially Koch himself. "So I would have great concerns of her testifying without being advised of her rights, of her having counsel." 6 VRP at 533.

The trial court stated, "What I do have some issues with are, A, this is a very late disclosure of witnesses." 6 VRP at 534. The trial court also voiced concern about prejudice to the State should Jennifer testify, "not only in those late disclosures, but also what sounds like 404(b) issues . . . for which there should have been notice to the other side." 6 VRP at 534. The trial court inquired whether Koch still planned on testifying and defense counsel responded that he did. In response, the trial court noted that much of Jennifer's testimony concerned "things that are within

[Koch's] knowledge" and that "a lot of this information will be available to the jury through Mr. Koch's testimony." 6 VRP at 534-35. As such, any "prejudice to the defense in excluding these witnesses" would be lessened. 6 VRP at 535.

The trial court also articulated its concern about Koch being able to present his defense, and therefore, the trial court reserved ruling on Jennifer as a witness. The court also recessed the trial for a day to allow defense counsel the opportunity to produce the notebook to the State. The trial court informed the parties that when trial resumed, the parties were expected to update the court "as to whether the notebook was provided, what all it supports or doesn't support. And then, I can make a better ruling under 404(b) with regard to Jennifer Koch's testimony." 6 VRP at 536.

b.       July 19 proceedings

After the recess, trial resumed on July 19. The State apprised the trial court of several developments since court was last in session. First, the State stated that it never received the notebook that purportedly documented Mackey and White's prior misconduct and was in Jennifer's possession.

Second, the State informed the trial court that following Koch's offer of proof regarding Jennifer's testimony, the State asked Detective Schieferdecker to review calls Koch made to his sister from jail. The State represented that in one call, Koch "had a lengthy conversation with [Jennifer] where he detailed to her specifically what she should testify to regarding Mr. Mackey and Mr. White." 7 VRP at 591. Specifically, Koch asked Jennifer to testify "that Mr. Mackey and Mr. White worked for him," that Jennifer "had some position with him as well," that "Mr. Koch[] did not pay attention to any accounts," and that "he had given [Mackey or White] his phone, and that from that phone, they were able to . . . get a bunch of [personal financial] information." 7

12

VRP at 591. The State emphasized that there was "significant coaching . . . going on in that particular call," and Jennifer's "follow-up questions" indicated "she doesn't have firsthand knowledge of what exactly is going on with Mr. Mackey and Mr. White." 7 VRP at 591. Specifically, Koch would "say something to [Jennifer]; she will repeat something back very slowly as though she's taking some sort of notes or writing something down as it's happening." 7 VRP at 591.

The State also informed the trial court that in a second call, Koch and Jennifer conversed "regarding availability of funds and payments." 7 VRP at 592. On the call, Koch referenced having "more than 100 different credit card numbers on [a] cell phone that he had on his person when he was taken into custody." 7 VRP at 592. Koch directed Jennifer to retrieve the phone from property and told her that once she had it, she could pull the credit card numbers and "purchase whatever she wanted" from an online makeup retailer. 7 VRP at 592.

The State further informed the trial court that in a third call, Koch mentioned stashing money "somewhere on the dark web." 7 VRP at 594. Koch also discussed boxes of drugs relating to a separate investigation. And, according to the State, the calls contained "a number of conversations about smuggling drugs into the jail using . . . jail clothes for court." 7 VRP at 595. Finally, in one call, Koch stated "that they are deciding not to bring the notebook in because they know it would be more criminal charges. [Koch] also tells [Jennifer] not to testify." 7 VRP at 616.

After updating the trial court, the State explained that "even if [Jennifer] were to testify, the State very much believes that she would need counsel and be communicating with counsel and everything else." 7 VRP at 598. Moreover, Koch coaching Jennifer's testimony evidenced his

13

"consciousness of guilt." 7 VRP at 598. And, the jail calls provided probable cause to charge Koch with witness tampering and potentially even "a leading organized crime case." 7 VRP at 600. However, the State acknowledged that Koch had a right to present a defense and clarified it did not intend to interfere with that right. Rather, the State was making a record "so that the defense and [Koch] can be fully informed of what's going on before they make any future tactical decisions or strategic decisions about how they move forward." 7 VRP at 604.

The trial court asked defense counsel for a response, noting that ER 404(b), Jennifer's late disclosure, and the existence of her purported notebook detailing Mackey's and White's prior misconduct would all play a role in "whether [Jennifer] testifies." 7 VRP at 605. Defense counsel responded that the notebook no longer existed because Koch's girlfriend had thrown it out. Defense counsel also represented that Koch called Jennifer two days prior and "learned that Ms. Jennifer Koch may not testify." 7 VRP at 606. Defense counsel, on behalf of Koch, explained that Koch never coached his sister's testimony, but merely told her to "'just tell the truth' . . . because she has significant memory issues" and diabetes. 7 VRP at 606-07.

The trial court asked defense counsel whether he still intended to call Jennifer and defense counsel responded, "Here's the problem, Your Honor, Ms. Koch is a single parent without a license. She has no one that can bring her to the court." 7 VRP at 607. Defense counsel also noted he had emailed the trial court's judicial assistant and requested that Jennifer be allowed to testify remotely.

The State objected to Jennifer testifying remotely. The State reiterated that its "position is not, oh, it's late disclosures or anything confrontation." 7 VRP at 694. The State acknowledged Koch's right to present a defense, but also recognized that Koch's right extended only to evidence

that was both material and favorable to the defense. "And so, recognizing the weighty interest of the defendant," the State objected to Jennifer testifying remotely. 7 VRP at 695. Specifically, the State noted that Jennifer's testimony was irrelevant because Koch would testify that Mackey and White were his employees. Moreover, given the jail phone calls and potential witness tampering, "the specific circumstances of [Jennifer] testifying . . . are prejudicial as to disrupt the fact-finding process at trial." 7 VRP at 696.

The trial court explained that there are "two components to testifying remotely." 7 VRP at 609. First, "[t]here's the Zoom meeting itself, which the Court sets up." 7 VRP at 609. Second, "[t]here is the sort of physical hardware that's necessary for Zoom testimony." 7 VRP at 609. The court explained that "it takes a decent amount of work" to set up "all the cameras and screen and everything else that needs to be arranged for remote testimony." 7 VRP at 610. "It's one reason why the Court needs a heads-up that that's going to happen, and the parties are responsible for making those arrangements and doing that themselves. The Court doesn't do it for them." 7 VRP at 610.

The trial court ultimately ruled that "if Mr. Koch takes the stand," he would be allowed "to testify about other employees at the company . . . who might have otherwise . . . committed these offenses, but I'm not going to allow testimony about other bad acts by those two employees, Mackey and White, because of limits set by 404(b)." 7 VRP at 614. The trial court further ruled that "[t]he first question of 404(b) is whether any prior bad acts . . . are established by a preponderance of the evidence, and that has not been done here. So really, that's a threshold question that, I think, resolves any 404(b) issues with Mackey and White." 7 VRP at 614. Koch's

testimony regarding Mackey and White would "be limited to what Mr. Koch knows personally, directly, not things that he learned from Jennifer Koch, to the extent that applies."[4] 7 VRP at 616.

The trial court excluded Jennifer's testimony pursuant to ER 404(b). After the trial court ruled, the State attempted to make a record concerning its objection to Jennifer testifying remotely. *See* 7 VRP at 694 ("Assuming for a moment that the defense is going to rest, and before the defense rests . . . I would like to make a record I referenced earlier."). In response, the trial court noted that the issue of whether to allow remote testimony "was moot because, as I understood . . . we didn't have the means to do a remote set-up separate from the State's objection and any other issues with allowing the testimony of [Jennifer]." 7 VRP at 699. The trial court continued, "But to the extent I need to address that, I will adopt the State's reasoning with regard to her testimony." 7 VRP at 699. As noted above, the State had argued that Jennifer should not be allowed to testify remotely because her testimony was propensity evidence, irrelevant, and given the jail phone calls and potential witness tampering, "the specific circumstances of [Jennifer] testifying . . . are prejudicial as to disrupt the fact-finding process at trial." 7 VRP at 696.

---

[4] Following Koch's testimony, the trial court revisited the jail call recordings. Koch, through his attorney, asked why the jail calls were relevant given that Jennifer was no longer testifying. The trial court responded that the recordings were "evidence of witness tampering. And witness tampering, I think, goes to credibility and also consciousness of guilt, which are two avenues for allowing it, at the very least in cross-examination, if not in the State's case-in-chief." 7 VRP at 697. The State and defense counsel subsequently argued over whether to admit a redacted or unredacted recording of the relevant jail calls. Eventually both parties withdrew their motions to admit either version of the call, and the jury never heard any of the recordings.

D.   KOCH'S DEFENSE

    1.    Direct Examination

Koch testified in his own defense. Koch explained that he established Supreme Auto Sound in 2019 as a sole proprietorship, but registered the entity as a limited liability company in October 2020. Through his company, Koch provided "car audio fabrication" services. 7 VRP at 628.

Koch testified that he opened a bank account for Supreme Auto Sound with Wells Fargo in January 2021. When asked why, Koch responded, "So I had a separate business account for my account entities. I had six other bank account[s]." 7 VRP at 633. Koch also acknowledged opening a business account for Supreme Auto Sound at Columbia Bank around May 2021. When asked why he opened a second account for his business, Koch responded, "So that I can have separate cards, essentially. . . . I had an accountant and one that I was trying to keep myself, and then for my accountant. And, therefore, whatever money goes in there, they could transfer it to that account, and then I can keep track." 7 VRP at 634. Koch denied altering any of the checks or depositing them into his accounts. Defense counsel showed Koch many of the checks that had been admitted into evidence and Koch denied endorsing all but two of them. The two deposits Koch acknowledged were a $19.13 cashier's check from HomeStreet Bank and a $1,400 "Economic Impact Payment" from the U.S. Treasury. Ex. 1 at 58.

Defense counsel also inquired into Supreme Auto Sound's financial management. Koch testified that his company grossed $250,000 in 2021. However, Koch could not say how much the company grossed between March and June 2021. Koch explained he "just always knew there was money in" his account but did not "pay attention to those kind of details." 7 VRP at 636. So long

17

as Koch saw "$20,000, $50,000, whatever" in his accounts, he did not worry about Supreme Auto Sound's finances. 7 VRP at 636. Koch also testified that he did not prepare or file Supreme Auto Sound's taxes; rather, "[t]he person I hired for accounting would do my taxes." 7 VRP at 670.

Koch testified that he entrusted his company's finances to one of his employees, Tyler Mackey. Koch originally hired Mackey as a fabricator, but Mackey's skills "were not up to par." 7 VRP at 635. Mackey informed Koch that he "had gone to school for [business] accounting," and Koch "took [Mackey's] word for that and hired him" as an accountant in March 2021. 7 VRP at 635. Prior to Mackey's hire, Koch's sister, Jennifer, managed Supreme Auto Sound's finances. Jennifer was dating another of Koch's employees, Jason White, at the time. Neither Mackey nor White filled out job applications prior to being hired, so Koch did not know whether they had criminal histories. However, Koch testified that he was "aware that they probably had some kind of criminal history or something like that." 7 VRP at 665.

Koch explained that between March and June 2021 he had two cellphones, one personal and one business. Koch gave Mackey his business cellphone. According to Koch, his business cellphone contained both the Wells Fargo and Columbia banking applications and their attendant usernames and passwords. The business cellphone also had Koch's "driver's license, Social Security number, everything like that." 7 VRP at 643. Koch testified that Mackey had access to all of that information. Koch also testified that Mackey made mobile deposits into both the Columbia and Wells Fargo accounts, but he did not explain how he knew that.

Finally, Koch testified that he did not review his Wells Fargo or Columbia bank accounts prior to June 2021. Koch did not learn about the fraud in his accounts until Wells Fargo contacted him about the fraudulent checks in June 2021. When Koch learned about the fraudulent checks,

Jennifer told him about Mackey and White's "extracurricular activities," but did not expand on what he or Jennifer meant by that. 7 VRP at 637.

2.      Cross-Examination

During cross-examination, Koch acknowledged several prior convictions: two for forgery; two for identity theft; and one for possession of stolen property, access device. The State then asked Koch how he knew his company grossed $250,000 in 2021 if he did not prepare his own taxes and Koch responded, "Because there's one number that I do get when the tax form is all finished. It shows you how much you're getting back or if you have to pay money. And it says the gross on there also." 7 VRP at 670.

The State questioned Koch about his use of CashApp, a mobile application that allows the user to transfer money "from one account to a different account." 7 VRP at 676. Koch testified that he would use CashApp to withdraw money from his Wells Fargo account.

Finally, the State questioned Koch about his sister, Jennifer. Koch acknowledged asking Jennifer to testify about Mackey's role at Supreme Auto Sound, but denied giving her "specific instructions on how she should testify." 7 VRP at 678. Koch also acknowledged discussing with Jennifer "how to access some funds" using Koch's username and password. 7 VRP at 679. When the State asked Koch whether he told Jennifer not to testify, Koch denied it, stating, "I told her that it's advisable to invoke your Fifth Amendment right because there's a possibility you can get in trouble if you're in possession of anything like that." 7 VRP at 683.

E.      OTHER EVIDENCE AND CLOSING ARGUMENTS

On rebuttal, Detective Schieferdecker confirmed that "[a]fter money was deposited via check in both the Wells Fargo and the Columbia Bank accounts, money was transferred to an outside . . . CashApp account" registered to Koch.  7 VRP at 728.

During closing arguments, Koch suggested that Mackey perpetrated the crimes with which Koch had been charged, arguing that Mackey had access to all of the requisite information.  "Mr. Koch should not be accused of all these charges because he clearly is a victim and knows who committed these crimes, which he testified: Tyler Mackey."  8 VRP at 778.

F.      VERDICT AND SENTENCING

The jury found Koch guilty as charged.  The State recommended that Koch receive a standard range sentence of 84 months on the first degree identity theft counts, 57 months on the second degree identity theft count, and 29 months on the forgery counts, all to run concurrent to one another.  The trial court adopted the State's recommendation and sentenced Koch to 84 months of total confinement and 12 months of community custody.

Koch appeals.

ANALYSIS

A.      SUFFICIENCY OF THE EVIDENCE

Koch argues his convictions should be reversed because "there was insufficient evidence to show he perpetrated the deposits or even knew the forged or altered instruments were put into the accounts."  Br. of Appellant at 38.  Specifically, Koch contends that "the State's evidence showing the element of knowledge was not sufficient."  Br. of Appellant at 40.  We disagree.

20

1.      Legal Principles

"Due process requires a criminal defendant be convicted only when every element of the charged crime is proved beyond a reasonable doubt." *State v. O'Hara*, 167 Wn.2d 91, 105, 217 P.3d 756 (2009). In addressing a challenge to the sufficiency of the evidence, "'we view the evidence in the light most favorable to the prosecution and determine whether any rational fact finder could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Conaway*, 199 Wn.2d 742, 748, 512 P.3d 526 (2022) (quoting *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009)). An insufficient evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence must be drawn in favor of the State and against the defendant. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

"A person is guilty of forgery if, with intent to injure or defraud: . . . He or she possesses, utters, offers, disposes of, or puts off as true a written instrument which he or she knows to be forged." RCW 9A.60.020(1)(b). A "forged instrument" is "a written instrument which has been falsely made, completed, or altered." RCW 9A.60.010(6).

A person commits identity theft when they "knowingly obtain, possess, use, or transfer a means of identification or financial information of another person, living or dead, with the intent to commit, or to aid or abet, any crime." RCW 9.35.020(1). The elements of first and second degree identity theft are the same, save that the former requires a violation involving items whose value exceeds $1,500. RCW 9.35.020(2), (3); *State v. Sells*, 166 Wn. App. 918, 923, 271 P.3d 952 (2012), *review denied*, 176 Wn.2d 1001 (2013).

"[A]lthough possession alone is not sufficient to prove guilty knowledge, possession together with slight corroborating evidence of knowledge may be sufficient." *State v. Scoby*, 117

21

Wn.2d 55, 61-62, 810 P.2d 1358, *amended on recons.*, 815 P.2d 1362 (1991).  Moreover, where "'the inferences and underlying evidence are strong enough to permit a rational fact finder to find guilt beyond a reasonable doubt, a conviction may be properly based on pyramiding inferences.'" *State v. Bencivenga*, 137 Wn.2d 703, 711, 974 P.2d 832 (1999) (internal quotation marks omitted) (quoting 1 CLIFFORD S. FISHMAN, JONES ON EVIDENCE: CIVIL AND CRIMINAL § 5.17, at 450 (7th ed. 1992)).  However, any inferences drawn from circumstantial evidence "must be reasonable and cannot be based on speculation."  *State v. Vasquez*, 178 Wn.2d 1, 16, 309 P.3d 318 (2013).

> 2.      Sufficient Evidence of Knowledge

We begin by noting that Koch challenges the sufficiency of the evidence by focusing almost exclusively on his own testimony.  Koch's defense was that "Mr. Mackey . . . very reasonably could have surreptitiously deposited the altered checks and then withdrawn the money for himself using other methods, effectively laundering the money for himself."  Br. of Appellant at 42.  However, apart from Koch's testimony and Detective Schieferdecker's statement that she could not be "one hundred percent positive" that Koch deposited the altered checks, neither party presented any evidence supporting Koch's theory of the case.  6 VRP at 559.

In a sufficiency of the evidence challenge, the defendant necessarily admits the truth of the State's evidence, and we must view the evidence in the light most favorable to the State and draw all reasonable inferences therefrom in favor of the State and against the defendant.  *Conaway*, 199 Wn.2d at 748; *Salinas*, 119 Wn.2d at 201.  Koch's convictions indicate that the jury found Koch's testimony not credible, and we will not disturb such a determination on appeal.  *State v. Bass*, 18 Wn. App. 2d 760, 780, 491 P.3d 988 (2021), *review denied*, 198 Wn.2d 1034 (2022).

a.      Forgery

Here, the State presented sufficient circumstantial evidence that Koch "possesse[d], utter[ed], offer[ed], dispose[d] of, or put[] off as true a written instrument which he . . . kn[ew] to be forged." RCW 9A.60.020(1)(b). For example, all of the checks at issue were altered to be payable to Koch himself or to his business, Supreme Auto Sound. The checks were deposited into Koch's two bank accounts, and Detective Schieferdecker testified that a CashApp account registered to Koch was used to withdraw money from both of Koch's accounts. While Koch denied endorsing any of the fraudulent checks, he also acknowledged that the endorsement signatures bore his name or initials. Also, Detective Schieferdecker testified that while many of the endorsement signatures did not match exactly, they were generally in the form of a "C" and "K" just like Koch's signatures on the Wells Fargo account application and Koch's judgment and sentence from a prior conviction. And Detective Schieferdecker testified that it is "[a]bsolutely" common for an individual altering a check to also alter their own signature. 6 VRP at 549. Furthermore, all of the fraudulent checks were deposited via mobile deposit, and McGinnis testified that mobile deposit was the only way to deposit checks into a bank account without leaving a visual record of the person depositing the check. Finally, of the 25 checks deposited into Koch's Wells Fargo account, only one check appeared to not be altered. And, as the account was Koch's business account, a reasonable inference would be that Koch knew about the altered checks being deposited into it as he transferred $36,638.79 out of his accounts through his CashApp account and an ATM. A reasonable trier of fact could infer from this evidence that Koch not only possessed, but offered or put off the altered checks as true.

23

As for whether Koch knew the checks were forged, the State presented sufficient circumstantial evidence of Koch's guilty knowledge. For example, Koch testified that he either did not know or did not do business with any of the payors listed on the fraudulent checks. A reasonable trier of fact could thus infer that Koch knew the altered checks were being deposited into his Wells Fargo account because all but one of the checks deposited into that accounts appeared to be altered, yet he continued to transfer money out of the account through his CashApp account and an ATM. Moreover, the State offered Koch's past forgery convictions precisely to show that he "could recognize . . . altered written instruments." Clerk's Papers at 228. While Koch testified he never altered or deposited any of the fraudulent checks, his conviction on all counts demonstrates that the jury did not find such testimony credible, and we will not disturb that determination. *Bass*, 18 Wn. App. 2d at 780.

b. Identity theft

The State also presented sufficient evidence that Koch committed identity theft when he "knowingly obtain[ed], possess[ed], use[d], or transfer[ed] a means of identification or financial information of another person, living or dead, with the intent to commit, or to aid or abet, any crime." RCW 9.35.020(1). Because Koch challenges only the knowledge element of the crime, we do not address the remaining elements.

As the foregoing discussion demonstrates, the checks, which clearly contained the identifying and financial information of others, were altered to be payable to Koch or his business and deposited into Koch's two accounts, bore endorsements signatures similar to Koch's acknowledged signature, and were withdrawn from Koch's accounts using a mobile application

24

registered to Koch. The evidence would allow a reasonable trier of fact to infer that Koch knowingly obtained, possessed, used, or transferred another's financial or identifying information.

We are not persuaded by Koch's argument that there was insufficient evidence presented that he knowingly committed forgery or identity theft because he testified he had no knowledge of his company's finances. First, in reviewing the sufficiency of the evidence, our focus is on the evidence most favorable to the State, not Koch. Second, Koch's argument is belied by the State's evidence. For example, Koch continued to withdraw money from accounts funded by the fraudulently altered checks despite not knowing any of the payors providing the funds nor having done any work for them. A reasonable trier of fact could thus infer that not only did Koch alter and deposit the fraudulent checks, but did so knowing he was not entitled to the funds.

We conclude that the State presented sufficient evidence of Koch's guilty knowledge with regards to both the forgery and identity theft convictions.

B. RIGHT TO PRESENT A DEFENSE

Koch argues the trial court violated his right to present a defense when it prohibited Koch from calling his sister, Jennifer, and his father, Richard, as defense witnesses. We disagree.

1.      Legal Principles

Criminal defendants have a constitutional right to present a defense under both the federal constitution and our state constitution. *State v. Romero-Ochoa*, 193 Wn.2d 341, 347, 440 P.3d 994 (2019), *cert. denied*, 141 S. Ct. 398 (2020); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. We employ a two-part analysis to determine whether a trial court's evidentiary decision violated the defendant's right to present a defense. *State v. Jennings*, 199 Wn.2d 53, 58-59, 502 P.3d 1255 (2022). We begin by asking whether the trial court's evidentiary ruling was an abuse

of discretion. *Id.* at 58. "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *State v. Lord*, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). If we conclude the trial court did not abuse its discretion, we then review de novo whether exclusion of the proffered evidence nonetheless violated the defendant's right to present a defense. *Jennings*, 199 Wn.2d at 58-59.

      2.     Jennifer Koch

      a.     Evidentiary analysis

Koch argues that the trial court excluded Jennifer's testimony as a discovery violation sanction, an "extreme remedy" not warranted by Koch's late disclosure of Jennifer's testimony. Br. of Appellant at 32. However, the trial court correctly excluded Jennifer's testimony because it was inadmissible under ER 404(b).

Criminal defendants must disclose "the names and addresses of persons whom the defendant intends to call as witnesses at . . . trial" "no later than the omnibus hearing." CrR 4.7(b)(1). Failure to comply with discovery obligations may subject the violating party to such sanctions as the trial court "deems just under the circumstances." CrR 4.7(h)(7)(i). "Exclusion or suppression of evidence . . . for a discovery violation is an extraordinary remedy and should be applied narrowly." *State v. Vance*, 184 Wn. App. 902, 911, 339 P.3d 245 (2014), *review denied*, 182 Wn.2d 1020 (2015).

Certain evidence may also be excludable pursuant to ER 404(b), which prohibits "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." Such evidence may be admissible, however, "for other purposes,

such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." ER 404(b).

Before admitting evidence of a person's prior misconduct,

"[T]he trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect."

*State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting *State v. Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)).

Here, the trial court excluded Jennifer's testimony regarding Mackey and White pursuant to ER 404(b). *See* 7 VRP at 614 ("The first question of 404(b) is whether any prior bad acts . . . are established by a preponderance of the evidence, and that has not been done here. So really, that's a threshold question that . . . resolves any 404(b) issues with Mackey and White."). Koch represented that Jennifer would testify that Mackey and White were Koch's employees and that she "learned that they were actively stealing checks and creating false credit cards, but not in the matter before us." 6 VRP at 528. When the trial court inquired whether Jennifer had personal knowledge regarding Mackey's and White's alleged misconduct or could otherwise corroborate it, defense counsel responded, "Mr. Koch is telling me Jennifer Koch has a notebook with all of the information about the stolen checks in the past." 6 VRP at 532. However, Koch never produced the notebook, nor did he explain the basis of Jennifer's knowledge regarding Mackey's and White's past misconduct. Because Koch failed to demonstrate by a preponderance of the evidence that Mackey or White "were actively stealing checks and creating false credit cards," the

trial court did not abuse its discretion by prohibiting Jennifer's testimony pursuant to ER 404(b). 6 VRP at 528; *Gresham*, 173 Wn.2d at 421.

Even if Jennifer had been timely disclosed as a defense witness, Koch would still have had to satisfy ER 404(b)'s threshold requirement by showing by a preponderance of the evidence that Mackey and White previously forged checks or stole another's identity. Thus, timely or late, Jennifer's testimony would have been excluded on the record before us. And even if the late disclosure of Jennifer as a defense witness played a role in the trial court's ruling, we "can affirm the trial court's rulings on any grounds the record and the law support." *State v. Grier*, 168 Wn. App. 635, 644, 278 P.3d 225 (2012).

b.      Constitutional right to present a defense

Having concluded that the trial court did not abuse its discretion by excluding Jennifer's testimony pursuant to ER 404(b), we review de novo whether the trial court's ruling violated Koch's right to present a defense. *Jennings*, 199 Wn.2d at 58-59. Under this second step of the analysis, we balance Koch's need for the evidence against the State's interest in excluding the evidence. *Id.* at 63.

A defendant's right to present a defense is not absolute. *State v. Arndt*, 194 Wn.2d 784, 812, 453 P.3d 696 (2019), *cert. denied*, 142 S. Ct. 726 (2021). Because a defendant does not have a constitutional right to present irrelevant evidence, the evidence presented must be at least minimally relevant to implicate the right to present a defense. *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). There is "a clear distinction between evidence" that is relevant "and evidence that, if excluded, would deprive the defendant of the ability to testify to their versions of the incident." *Jennings*, 199 Wn.2d at 66.

28

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. However, even assuming without deciding that Jennifer's testimony was relevant, the State's interest in excluding her testimony outweighed Koch's interest in presenting it, and Koch was still able to present his theory of the case despite Jennifer's exclusion as a witness.

Here, the State had a strong interest in excluding Jennifer's testimony. When the trial court inquired into whether Jennifer had personal knowledge of Mackey's and White's alleged wrongdoings or could otherwise corroborate it, Koch represented that Jennifer had "a notebook with all of the information about the stolen checks in the past." 6 VRP at 532. However, Koch never produced the notebook. Moreover, when Koch informed the trial court that he could not produce the notebook, no other evidence was provided to the trial court regarding Jennifer's personal knowledge of Mackey's and White's alleged wrongdoings. Furthermore, the State informed the trial court that Jennifer's "follow-up questions" during one of the jail calls with Koch indicated "that she doesn't have firsthand knowledge of what exactly is going on with Mr. Mackey and Mr. White." 7 VRP at 591. "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." ER 602. Without an adequate showing that Jennifer had personal knowledge of Mackey's and White's prior misconduct, the State had a strong interest in excluding Jennifer's testimony.

The State's interest in excluding Jennifer's testimony outweighed Koch's need to present it because Jennifer's testimony was not necessary for Koch to present his theory of the case. Koch denied altering any of the contested checks or using mobile deposit to deposit them into either of

his accounts. Koch also testified that he hired Mackey as an accountant in March 2021. Koch explained that he did not "pay attention" to his company's finances; rather, he entrusted them to Mackey. 7 VRP at 636. Koch also testified that Jennifer worked for him and that she handled the company's accounting before Mackey took over. Koch went on to testify that between March and June 2021, he had a personal cellphone and business cellphone. Koch gave Mackey his business cellphone. Koch testified that the cellphone had both the Wells Fargo and Columbia Banking apps installed, as well as each account's corresponding username and password. The cellphone also contained Koch's "driver's license, Social Security number, everything like that." 7 VRP at 643. Koch testified that Mackey had access to that information and would make deposits for the business at both banks.

The record shows that Koch was able to present his theory of the case—that one of his employees was responsible for the forgeries and identity thefts. The trial court's exclusion of Jennifer as a witness did not impede Koch's ability to present his theory of the case. Also, Jennifer's testimony regarding Mackey's and White's employment at Supreme Auto Sound would have been cumulative of Koch's own testimony, and Mackey's and White's employment at Supreme Auto Sound was not a contested issue.

Moreover, we note that despite the trial court's prohibition on "testimony about other bad acts by [Mackey and White]," Koch nonetheless hinted that such misconduct took place. 7 VRP at 614. For example, Koch testified that after Wells Fargo notified him that fraudulent checks had been deposited into his account, Jennifer told him "about the activities, the extracurricular activities that Tyler Mackey and Jason White, one of my other employees." 7 VRP at 637. Koch also testified that because none of his employees submitted job applications, he did not know

whether they had any criminal history. However, Koch added that he was "aware that they probably had some kind of criminal history or something like that." 7 VRP at 665. Thus, Koch was not only able to present his theory of the case, but he was inexplicably allowed to suggest that not only were Mackey and White in a position to commit the crimes with which Koch was charged, but had a propensity to do so. Accordingly, the trial court's decision to exclude Jennifer as a witness did not violate Koch's constitutional right to present a defense.

3.      Richard Koch

a.      Evidentiary analysis

Koch argues that the trial court excluded Richard's testimony as a discovery violation sanction, an "extreme remedy" not warranted by Koch's late disclosure of Richard's testimony. Br. of Appellant at 32. We disagree.

As noted above, evidence is relevant when the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Even relevant evidence can be excluded, however, if the trial court finds that "its probative value is substantially outweighed by the danger of . . . needless presentation of cumulative evidence." ER 403. Evidence may also be inadmissible under ER 404(b) where the party offering the evidence of prior misconduct fails to demonstrate that the misconduct actually occurred by a preponderance of the evidence. *Gresham*, 173 Wn.2d at 421.

Here, Koch stated that Richard had "the same knowledge that Jennifer Koch has, but for he didn't do the accounting." 6 VRP at 528. When the trial court inquired whether Richard's testimony would also "support[] this 404(b) issue of the employees," defense counsel responded,

31

"It would be verification that they were actually employees of Supreme Auto Sound." 6 VRP at 536. Therefore, the record shows that Koch did not offer Richard's testimony as evidence of Mackey's and White's prior misconduct, but as further evidence of their involvement with Koch's finances. However, even if Richard's testimony had been offered as evidence of Mackey's and White's prior misconduct, it was still inadmissible for the same reason Jennifer's testimony was inadmissible: Koch failed to show, by a preponderance of the evidence, that the prior misconduct actually occurred. *Gresham*, 173 Wn.2d at 421.

As for Richard's testimony that Mackey and White were Koch's employees and privy to his tax information, the trial court properly excluded such testimony as needlessly cumulative. As the trial court explained, given Koch's testimony that he employed Mackey and White and that Mackey's tasks included preparation of tax materials, Richard's testimony was "duplicative and otherwise not helpful to the trier of fact." 7 VRP at 621. Moreover, the fact that Mackey and White were Koch's employees was not a disputed fact. Thus, the probative value of Richard's testimony was "substantially outweighed by the danger of . . . needless presentation of cumulative evidence." ER 403. Because Richard's testimony was both cumulative and inadmissible under ER 404(b), the trial court did not abuse its discretion by excluding Richard as a witness.

b. Constitutional analysis

Having concluded that the trial court did not abuse its discretion by excluding Richard's testimony, we review de novo whether the trial court's ruling violated Koch's right to present a defense. *Jennings*, 199 Wn.2d at 58-59. Under this second step of the analysis, we balance Koch's need for the evidence against the State's interest in excluding the evidence. *Id.* at 63.

We begin by acknowledging that the State had a lesser interest in excluding Richard's testimony than it did in excluding Jennifer's, given that Richard was expected to only testify that he "visited Supreme Auto Sound numerous times and knows Jason White and Tyler Mackey were employees." 7 VRP at 611. However, given that Richard's knowledge extended only to Mackey's and White's employment status, Koch's interest in presenting Richard's testimony was also lower. Ultimately, given that Koch testified regarding Mackey's and White's employment at Supreme Auto Sound, which the State did not dispute, and about Mackey's participation in Supreme Auto Sounds' financial workings and his access to Koch's bank accounts and personal financial information, Richard's testimony was unnecessary to present Koch's theory of the case. Accordingly, the trial court's decision to exclude Richard as a witness did not violate Koch's constitutional right to present a defense.

## C. Ineffective Assistance of Counsel

Koch argues that defense counsel performed deficiently by (1) failing to disclose Jennifer and Richard as potential defense witnesses, and (2) failing to determine prior to trial whether the trial court would permit remote testimony. Koch contends that he was prejudiced by defense counsel's failures because they resulted in the trial court excluding Jennifer and Richard as defense witnesses. We disagree.

### 1. Legal Principles

Both the Sixth Amendment to the United State Constitution and article I, section 22 of the Washington State Constitution guarantee criminal defendants the right to effective assistance of counsel. *State v. Bertrand*, 3 Wn.3d 116, 128, 546 P.3d 1020 (2024). To prevail on a claim of

ineffective assistance of counsel, the petitioner must show (1) deficient performance by counsel, and (2) that counsel's deficient performance prejudiced them. *Id.*.

Counsel performs deficiently if, considering all of the circumstances, their performance falls below an objective standard of reasonableness. *Id.* at 128-29. We begin with a strong presumption that counsel's performance was reasonable, but a petitioner can overcome this presumption by showing the absence of any legitimate trial tactic or strategy in counsel's performance. *Id.* at 128. To show prejudice, the petitioner must demonstrate that "'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Id.* at 129 (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)).

2.     Failure to Timely Disclose Witnesses

Koch first argues that defense counsel "unreasonably failed to comply with discovery obligations mandated by CrR 4.7(b) and timely give notice of two witnesses," Jennifer and Richard Koch. Br. of Appellant at 23. This argument fails.

Criminal defendants must disclose "the names and addresses of persons whom the defendant intends to call as witnesses at . . . trial" "no later than the omnibus hearing." CrR 4.7(b)(1). Because failure to comply with discovery obligations may result in exclusion of the offending party's evidence, failure to timely disclose witnesses could constitute deficient performance if a defendant could show an absence of strategy or tactics behind the party's failure to disclose. *Vance*, 184 Wn. App. at 911; *Bertrand*, 3 Wn.3d at 128.

The record, however, shows that the failure to disclose Jennifer and Richard as potential defense witnesses is attributable to Koch himself, rather than to defense counsel. Prior to jury

selection, defense counsel informed the trial court that Koch had "[n]o other witnesses other than the defendant, Your Honor." 3 VRP at 48. It was not until immediately after the State had called its final witness that defense counsel stated, "I will also make an offer of proof as to *the defendant's concern* [that] more information needs to be provided from his sister, Jennifer Koch." 6 VRP at 426 (emphasis added). Moreover, when the trial court asked defense counsel whether Jennifer had "any documentation" of Mackey's and White's prior misconduct, defense counsel responded, "Mr. Koch is telling me Jennifer Koch has a notebook with all of the information about the stolen checks in the past." 6 VRP at 532. In fact, defense counsel stated that he had "just learned of" the notebook himself. 6 VRP at 532. Finally, recorded jail calls show that Koch called Jennifer during trial and coached her on what her testimony should be.

"An attorney's action or inaction must be examined according to what was known and reasonable at the time the attorney made his choices." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 722, 101 P.3d 1 (2004). And, as the Supreme Court explained, "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland v. Washington*, 466 U.S. 668, 691, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The record before us suggests that Koch's desire to have Jennifer and Richard testify changed after the State presented its case-in-chief. Thus, we cannot say that defense counsel's failure to disclose Jennifer and Richard as potential defense witnesses was unreasonable.

Even if we were to assume that defense counsel's failure to disclose Jennifer and Richard was unreasonable, Koch's ineffective assistance claim would still fail because he fails to show prejudice. Koch argues that had Jennifer and Richard been allowed to testify, the jury would have been provided with "much more contemporaneous observations of Mackey, how he conducted

himself at work, and the extent of his involvement with the business bank accounts." Br. of Appellant at 28. However, Koch's argument ignores the fact that even had defense counsel timely disclosed Jennifer and Richard as defense witnesses, the trial court would still have prohibited either from testifying pursuant to ER 404(b) and ER 403, as discussed above. Furthermore, Koch fails to identify testimony from either Richard or Jennifer that was either not duplicative of his own testimony regarding Mackey's and White's involvement at Supreme Auto or not inadmissible under ER 404(b). Finally, Koch fails to acknowledge that had Jennifer testified, the State would have cross-examined her concerning her phone calls with Koch while was he was in jail, which could be reasonably inferred as not helpful to Koch's defense.

Koch baldly claims that Jennifer's and Richard's testimonies impacted "Mr. Koch's credibility" and the credibility of his theory of the case. Br. of Appellant at 28. Koch's claim complains about the inability to present corroborating evidence, not that counsel provided ineffective assistance. Regardless, as discussed above, the trial court properly ruled that Jennifer's testimony was not admissible under ER 404(b), and Jennifer's and Richard's admissible testimonies were duplicative and cumulative of uncontested facts. Neither of these circumstances support a claim of deficient performance or prejudice.

Because Koch fails to show that defense counsel performed deficiently, or that he was prejudiced by defense counsel's allegedly deficient performance, his ineffective assistance claim fails.

3.      Remote Testimony

Koch argues that defense counsel also performed deficiently "by failing to be aware of the availability of remote testimony [or] the necessity to obtain the court's permission for a witness to testify remotely." Br. of Appellant at 30. We disagree.

Koch is correct that defense counsel failed to inquire about the availability and feasibility of remote testimony prior to trial. *See* 7 VRP at 609 (defense counsel states, "I thought I would [be] able to set up Zoom itself, so I made a mistake in that regard"), and 7 VRP at 610 (defense counsel states, "I'm learning as I go" in response to trial court's explanation of remote testimony). However, based on the record, defense counsel's failure to request remote testimony prior to trial can be attributed to Koch's failure to disclose Jennifer and Richard as potential witnesses to his own counsel until the middle of trial. Moreover, even if Jennifer and Richard had been disclosed as defense witnesses prior to trial, the trial court would not have allowed either to testify because their testimony was both improper under ER 404(b) and cumulative of Koch's own testimony. Thus, Koch fails to show deficient performance or prejudice, and his ineffective assistance of counsel claim fails.

## CONCLUSION

Sufficient evidence supports Koch's forgery and identity theft convictions. Also, the trial court did not violate Koch's right to present a defense by excluding Jennifer and Richard as defense witnesses because their testimony was not admissible and Koch was nonetheless able to present his theory of the case. Furthermore, Koch's ineffective assistance of counsel claims fail. Thus, we affirm Koch's convictions.

No. 58702-5-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Maxa, P.J.

Glasgow, J.